The next case for argument is 21-1039, SIPCO v. Emerson Electric. Is it Stach? Yes, ma'am. Mr. Stach, please proceed. Thank you, Your Honor, and may it please the Court. I'd like to start today by talking about the errors regarding claims 11-15 in the Board's decision. The Board upheld those claims in the Mason 545 IPR, but found them unpatentable in the Johnson 547 IPR. The Mason findings are not on appeal, so if the Johnson grounds do not support unpatentability, then the claims should be confirmed. Claim 11 refers to providing a controller to determine if at least one received message is a duplicate message and determining a location from which the duplicate message originated. The Board combined two references that it expressly found did not disclose this feature. The first is Johnson, which the Board correctly found to discard duplicates and did not separately determine the location from which duplicates were generated. And the second is Ehlers, which the Board also correctly found not to disclose duplicates at all, let alone tying determining a location to the duplicate detection. These findings were in relation to the other three grounds that Emerson had raised regarding the unpatentability of Claim 11. And so what we have here is actually a gap between these references. Neither discloses or links determining a location with duplicate detection. And this is not merely a gap in a motivation to combine. This is actually a missing claim feature. Essentially, there's an inventive step that the Board had to take in combining these two references to get to the claim feature that's in Claim 11. Well, now Ehlers discloses the determination of location with a location trigger, right? It does disclose a location in, for example, someone's house if a light bulb was in a hallway versus the kitchen, something like that. It has location as a feature of the invention. Yes, Your Honor. It doesn't tie that to any duplicate detection, but it does provide identifying a location within a home. Okay. You're focusing on Claims 11 at SEC, right? Yes, Your Honor. For right now, I do plan to talk about the preamble as well later, which applies to other claims, but for Claim 11. Let me clarify something that comes up in the red brief, and I'm sure you've seen it, but the red brief asserts that I think pages 5 and 54, that if we reject your position on the preambles, then that disposes of everything except Claims 11 at SEC. Is that right? No, that is not right, Your Honor. Why not? The reason is because we do need to win reversal of the claim construction on the preamble to then have the format and message argument become relevant. Okay, so at least the format issue goes away. Is that correct? If we disagree with you on preamble. So, you are correct, yes. Because there is a scenario where if the court reverses on the claim construction, but then remands to the board, where the board then needs to determine the effect that the preamble has on Mason and Johnson, and if they find, for example, that we've overcome the Johnson grounds based on the preamble, but they don't find that we've overcome the Mason grounds based on the preamble, then the format and message could save those claims related in the Mason IPR. So, it is sort of, it's a very specific, I recognize a very specific factual scenario, but we wanted to make sure that we addressed the format and message. Okay. Just to be sure that we covered that. So, back on claim, on the duplicate detection, we have this missing claim feature from the references, and the question is can that gap be filled in some way? And we mentioned Arendi, we mentioned that you wouldn't really be able to fill the gap here with common sense or expert testimony. The board actually addressed this in their decision as well, because they correctly found that location determining was not unusually simple or particularly straightforward. And then at appendix 112, they also said that petitioner has not shown that associating a location with duplicates is a well-understood function, such as simply sending and receiving messages. Now, this was in the context of Johnson alone, but these findings are irreconcilable with the finding of unpatentability when they combine Johnson with Ehlers. And so, because these are irreconcilable findings, and in particular because the original findings are supported by the record, supported by Johnson, Johnson's a very complex reference, 85 pages long, without the lengthy certificate of correction. It's not something that could be simply added in through common sense or just expert testimony saying, oh, they would have done this. And so that's a primary problem with the Johnson-Ehlers combination, but there's a second problem with it as well. The second problem does relate to the board's motivation to combine. It lacks substantial evidence because Johnson's meters are fixed meters. We're talking about gas meters, electric meters. The power company needs to know where to send the bill. They know where their meters are located. They know how far they're spaced apart. And so we had argued there's no reason to add into Johnson a location-determining feature because Johnson already knows where its meters are. And Johnson is also very concerned about, as Emerson admits in their motivation, their motivation is we want to minimize bandwidth usage in Johnson. And that helps avoid some problems. And here what they're suggesting is to then increase the processing load within Johnson to determine a location from which duplicates are generated even though we already know where the meters are located in Johnson. I found this a little unclear from the briefing, but help me out. Isn't it even the case that even with fixed locations that it is useful to know which particular locations are generating the problems which are creating the duplicates? Yes, I think there is testimony from their expert about that. And I think that there can be value in knowing when a meter is— Even if they're fixed. Yeah, even if it's fixed, I think that's correct. But then the question becomes, do you then add in this extra processing load into Johnson with this duplicate detection and location tracking angle when we already have another way to figure out the answer to that question, where are these meters located? It's already well known. And when the board looked at this, they acknowledged that we made this— These meters, are you talking about the meters that are malfunctioning? Really, all of the meters are in no locations. That's what you need to know, right, which is malfunctioning. Yes, and you can— Isn't that important to determine? Can't that be determined more efficiently or at least as efficiently with a location detection mode like Ehlers? I don't think it would be as efficiently because you're adding a significant additional layer of bandwidth usage into Johnson if you were to do that. And that's contrary to the motivation that Emerson has talked about, which is to minimize bandwidth. They don't want additional loads on the signal paths within Johnson. And what they're saying is if you can figure out what is faulty, which meters are causing more duplicate messages, maybe you can solve that problem and then reduce the bandwidth by getting rid of some of those duplicates. But the problem is their solution is to add in a lot of extra processing into Johnson and add in location information that would in fact increase the bandwidth demands and maybe lead to further issues, additional collisions, things like that. And there's not a reason to do that. As you see, Johnson has multiple mitigation strategies for how it balances its system when it discloses how it is dealing with the duplicate issue. And so adding this on top of it when you already know, okay, the meter that's meter number 30 is located at address XYZ. Why would we add that in and increase the bandwidth demands within Johnson when we know that the entire motivation from Emerson is that we want to minimize that bandwidth? We can figure it out a different way that does not burden Johnson's system with the Ehlers information. If we look at what the board said on this at appendix 148, they really don't address any of these questions that you're raising, Judge Bryson, and that we had raised. They acknowledged that we argued that there was no reason to add this into Johnson. But then the entire analysis consists of them looking at the 708 patent, saying that the claims do not require or are not limited to mobile devices, that it can include stationary devices, and then looking at the 268 patent, which is in the priority chain of the 708 patent. And so they really just looked at what did the inventors teach here? What's the scope of the claim? They didn't go back and say, what actually would have been obvious to one of ordinary skill in the art in light of Johnson, in light of Ehlers? Their entire analysis, if you look at it at appendix 148, focuses inwardly on the 708 patent, inwardly on the inventor's statements about this. And that's improper, I think, as a matter of law to do that. That's hindsight. But it also doesn't address all of these other reasons why one would not have been motivated to do this. So I'd like to turn to the preamble argument here. So there were two primary errors in the board's analysis of the preamble. The first was that they did not require communication between two like devices. They said that you could have one device as claimed, and then some other kind of device. And that other kind of device has more limited capabilities and effectively could be a dead end in the system, so you don't end up with all of these pathways that can carry both command and sense data, the way that we've argued. They make this error clear when they talk about the term another in the body of claim one. They say that another wireless communication device could... Their analysis really just says it may mean a different type of device. They didn't say it, in fact, is a different kind of device. They just said it may mean a different kind of device. And then they cited a case that suggests that another may be an indefinite article, in their view. So their analysis is actually quite limited. It's one paragraph, appendix page 21 in the 545, and then it's the same paragraph in appendix 86 to 87 in the 547. But they essentially just say that another may be an indefinite article in some context, and that there are some cases, or one case anyway, that says that it might be. Counsel, what do you understand is the reason why patent applicants cite prior op to the patent office? Well, I think they have a duty to the office to do that, for one. A duty to cite what kind of references? Material. Those that are material.  His patent cites 40 columns of references. Yes, Your Honor. If they're all material, I mean, what is there to this invention? Or are they trying to bury relevant references by citing hundreds, if not thousands, of references? Is that a misuse of the system? I don't know if it's a misuse of the system. I think that the system has shifted to where people tend to be cautious and try to make sure that there's not a claim later. And I recognize that maybe some may view the line as different, and maybe some may view what may be appropriate, because references were raised in litigation. When a party tells you in litigation, these are all references we might rely on, then you go and generally you provide those to the patent office. And you don't want to be left open later on to a claim that, oh, you were on notice. We told you this, right? And so I think a lot of the times when we see, as a practical matter, a lot of references, it's because the system is set up in such a way where once you're told by another party that something might be relevant, you're really risking it to not put it in front of the office. And I don't know the details of every reference that was cited here. But I understand your point, but that's the best I have on that. I am into my rebuttal time, so I will take a seat unless there are other questions at the moment. Is it Halward-Dreimer? Am I getting that right? Halward-Dreimer. Oh my gosh, I'm going to be a mess today. Say it again. Say it for me again. Halward-Dreimer. Halward-Dreimer. Thank you. Please proceed. A mouthful. I know. It took our kids quite a while to learn to write. Oh, yeah. That's a lot of bubbles on the SATs. Yes. All right. May it please the Court, I will address the argument with respect to Claims 11-15. First, as Appellant did, what the Board found, and this is, of course, reviewed for substantial evidence, and the Board is very careful at pages 73 through 79 to explain its rationale, or rather, 71. We start with the motivation to combine. Johnson is very clear that a problem it identifies is collisions, when two messages are being sent at the same time, and it points to location as one of the ways to address that problem, and it says that you can, by addressing the spacing, reduce the problem of collisions. But Johnson doesn't say how to identify that location. Ehlers, the Board notes, addresses the same kind of system of controlling and monitoring remote meters. It's the same kind of system, and it has the same kind of structure. But one thing that Ehlers discloses specifically that Johnson does not is that one would include the location as part of the identification for the signal, where it's coming from. And so the Board acknowledges, and it relies on Emerson's expert at paragraphs 109 and 496, as explaining that to further address this problem of collisions, one would simply modify Johnson by adding location as an additional part of the identification of the center. And that once one has that, that's the motivation, because it makes the system more stable. The fewer collisions one has, the less bandwidth that's being used unnecessarily. And once one has done that... I'm just out of curiosity, because it doesn't really come out in the briefs. How is location a factor that determines the reduction or increase in the number of collisions? Is it simply the speed of light, and the farther apart they are, the less the same message will be in the area? I think it's because of the spacing, and whether it's all consistent spacing so that messages are being sent at the same time, or they're set in a way that's more staggered. But why does location matter for that purpose? What is the physics of it, just out of curiosity? Your Honor, I'm not sure that that's disclosed, and I'm not sure that I would give you an accurate response. What Johnson specifies is that it is the spacing of the RCNs that matters in terms of reducing these collisions. And so that raises this issue of location, and suggests that location is important to resolving. And Emerson's expert picks up on this and says, yes, and so one would modify Johnson to include this information that Johnson identifies as important of location in the data structure, because the data structures are similar. And that once one has modified Johnson in that fashion, then the deduplication, which is the claim here, is done by Johnson as modified. Johnson already talks about deduplicating, and it talks about doing so based upon identifying the address field. But if the address field now includes the location, because of the modification with Ehlers, then you've identified the source of the message, including its location, and I'm reading from appendix 146, which is page 71 of the final written decision, because in this combination, now as modified by Ehlers, RCN uses device entry and includes the device location to identify the sending device. Emerson's expert explains that in doing deduplication, which again, Johnson discloses we want to do, using the location would be advantageous, because, for example, one could deduplicate the one that's more remote. That would be efficient. And this is, again, in paragraph 496, which is at... That's what I said in his report. Yes. Where in Johnson itself is that disclosed? The deduplication? Yeah. Your Honor, the deduplication in Johnson is in column 24, which is in appendix 11-157. I'm sorry, that's the collisions language. Your Honor, I apologize. Johnson, with respect to the deduplication, is at column 52. It talks about eliminating message redundancy. So, again, this is on substantial evidence review. The Board has explained its basis. It's identified... It's just basically saying message redundancy is a bad thing. Yes. Right. It doesn't go on to say anything about how... It says to eliminate the duplication. And you're supposed to identify whether there's a duplicate by looking at the address field of the NSM packet. So that's how you identify. That's one of the things you have to look at to identify whether it's a duplicate. So now that you have... That just tells you that it's a duplicate. It doesn't tell you anything about how to get rid of the duplicates. Well, Johnson discloses that it would be discarded, Your Honor. The duplicate. But which one to discard is what Mancetti says. You would want to look at location, and you would discard the one that is more remote. So Mancetti explains why you would use this modification in a way to operate the... Yeah, what's troubling me, and you can explain why it shouldn't be troubling me, is that Mancetti... A lot of this seems to be Mancetti's bridging the gap rather than the references bridging the gap. In other words, Mancetti is saying, ah, the way you can deal with this duplication problem by using location is to get rid of the ones that are farther... I don't see any of that in either Ehlers or Johnson. Ehlers does not address duplication. That's in Johnson, Your Honor. And Johnson doesn't specifically say to use location to do that. In fact, the board found that Johnson itself did not. Then we wouldn't have to have the combination. That's right. But it does talk about using the address field to identify whether it is a duplicate, and if the address field now includes the location because it's been modified with Ehlers, then you have the information that allows you to decide which to deduplicate, which to discard. And that's what... Mancetti does help bridge the gap, but that's, again, substantial evidence review is very deferential, and the question is, is there a basis to conclude that there would be a motivation to combine? Yes. And that so combined, it would disclose, and there is a substantial basis. I do want to turn to addressing the question about whether the preamble is limiting because here the preamble simply recites the intended use. It's not a limitation. And it simply recites that it's for communicating commands and sends data. The claims are very carefully crafted. All of them do include something with respect to communicating commands and sends data, but they do so very differently. Claim one, for example, sends a message with command and data, but it only discloses receiving a message with a command. Claim 11 discloses receiving a message with command and data. And claim 12, the dependent claim, talks about receiving and formatting a message with command and data. So all four, both ways. But that's only in claim 12, the dependent claim. Claim 22 talks about receiving and formatting a message with command and data. So all four are in claim 22, but they're not in claim one. Claim 23, a dependent claim to claim 22, talks about that data being sensed data. What SIPCO wants to do is use this language that is very vague and general in the preambles to obliterate all of the fine distinctions between the claims and suggest that every one of the claims must be not only bidirectional, both sending and receiving both command and data both ways, but also that it must be able to do so according to multiple paths to the gateway. The gateway is not referenced in any of these claims, nor in the preamble. So they're trying to import, through this general preamble language, language that's not in any of the claims or supported by it, nor is it supported by the specification. The only thing that they point to in support is actually their own experts' handwritten marks on the figure 2. That's not... These are the arrows? These are the arrows, the blue and the red arrows that they showed. That's not a disclosure that's sufficiently important in the specification that leaving it out of the claims renders the invention sort of something other than what the patent owner thought it was inventing. With respect to antecedent, there's no antecedent argument even with respect to Claim 11, but with respect to Claim 1, they say that the phrase another wireless communication device requires an antecedent. But this court's decision in predicate logic makes clear, by contrasting language of another instantiated index as being perhaps an instantiated index that was generated by some process other than the claimed process from another of said instantiated index, which required an antecedent. In that case, the claim language used another of said. But isn't it fair to say that in this case, consistent even with your approach to the preamble, that a portion of the preamble clearly is limiting in that a wireless communication device and then leave out the rest of the preamble, comprising A, B, C, D, E. And if a wireless communication device is limiting by defining the device, then doesn't the another problem fall away? You're right, Your Honor, in that they need to succeed not only to show that it's limiting, but that it has to carry all of this extra baggage. You're right. To say simply... We've said that portions of preambles can be limiting and other portions not. That's right, Your Honor. And even if you said that it had to be a wireless communication device, what they need for it to have is a wireless communication device with all of the limitations of the claimed wireless communication device. That's what predicate logic says you can do if you say another said wireless communication device. But here they didn't do that. So they don't carry with it all of the limitations with respect to the claimed wireless communication device. And as I said before, in each of these claims, what that wireless communication device does is something different. So it doesn't connote this sense of first bidirectionality, but also by multiple paths so that you can get to the gateway. But I do want to make the point that even if it carried all of that, Mason figure one has the same cycle. In fact, Mason figure one actually has arrows that run in both directions, which their expert has to fill in. So Mason does disclose that circle. And Johnson would disclose it too with respect to the edge RCMs. They will communicate with the IDT depending upon which has the better communication through one another, depending upon which has the better communication. So even if that were required and imported right into the claims through the preamble, it would be disclosed. And I want to underscore that with respect to bidirectionality alone, the board found with respect to Claim 22, both as to Mason and Johnson, that, remember I said before, Claim 22 says receive and format both command and data. And they didn't contest before the board that Johnson disclosed both ways of sending both command and data and receiving both command and data, or that Mason did that. So the bidirectional doesn't get them anywhere. They need this notion of multiple paths to a gateway. Again, the gateway not even being cited anywhere in any of these claims. And their support for that is a statement in the summary that other prior art had a problem of single-node failure. But their own Figure 2 shows repeated points that would be subject to single-node failure. So it would not solve that problem. Unless there are any questions, Your Honor. Thank you. Thank you. Mr. Speck, you have some of our time. Thank you, Your Honors. So on the point about Johnson and message redundancy in Column 52 that they pointed to, discarding duplicates, Johnson does not say that all redundancy is bad. In fact, it says in Column 52, Line 30, the passage that counsel pointed to, it says, Message redundancy is a fundamental feature of the wide-area communication network contributing to the system's ability to achieve a high probability of reception of NSM messages. Now, the problem is that in Johnson, they recognized that you could lose pathways if they say that in an urban environment, some pathways may go down. So they want to have redundant pathways where you may get duplicates, but they don't want too many because then you end up with the collision problem that's being discussed. And so when you look at this, it's not as simple as just saying, let's get rid of all redundant pathways, let's get rid of all duplicates. It's actually a feature that allows Johnson to have a high reliability, a high message reception rate. The fact that there are these redundant paths, and in fact, in Column 24, which counsel initially pointed to, it says there are two issues that affect the message loss rate. And the first that's identified at line 34 is path loss, which is caused by the nature of the urban propagation environment. And the second one is simultaneous message transmissions or collisions. And so he then identifies multiple techniques that help balance these two considerations. It's a balanced system. You may hear that a lot, finely tuned, that sort of thing. It is the real deal here. He has two competing objectives. And so to import an increased bandwidth by adding extra information, like a location, when you don't need to, because we already have another way to figure that out, that is contrary to what is in Johnson. Okay, thank you, counsel. This case is taken under submission.